## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ATLANTIC ACQUISITIONS, LLC,

      Plaintiff,

v.

J.H. REID GENERAL CONTRACTOR, ERIC REID, JAMES REID, REID COMMODITIES, LLC, LCH COMMODITIES, LLC, AND JLB COMMODITIES, LLC,

      Defendants.

Civil Action No:

## COMPLAINT OF ATLANTIC ACQUISITIONS, LLC

### NATURE OF THE ACTION

1.    Plaintiff Atlantic Acquisitions LLC ("Atlantic") brings this action to recover damages for multiple breaches of a contract (the "Project Agreement") by Defendant J.H. Reid General Contractor ("J.H. Reid"), as well as for breach of the implied covenant of good faith and fair dealing and intentional interference with contractual relations by Reid Commodities, LLC, James Reid and Eric Reid, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(3) and 1962(c).  In addition, derivatively on behalf of LCH Commodities, LLC and JLB Commodities, LLC (collectively, the "LLCs"), Atlantic, a minority shareholder in both LCH Commodities, LLC and JLB Commodities, LLC brings the action to recover damages for breach of fiduciary duty, conversion, and seeks both an accounting and a constructive trust.

## PARTIES

2.      Atlantic is a Massachusetts Limited Liability Corporation with a principal place of business at 36 Commerce Way, Woburn, Massachusetts 01801.  Atlantic was formed under the Massachusetts Limited Liability Company Act.  Atlantic has three managers, Joseph E. Montalto, Jr., Salvatore Tecce, and Gabriel Frassetti.  Atlantic's general purpose is to acquire the demolition and salvage rights to out-of-commission industrial structures for the purpose of demolishing those structures, selling the scrap materials and preparing the surrounding property for future development.

3.      J. H. Reid is a New Jersey corporation with a principal place of business at 3230 Hamilton Boulevard, South Plainfield, New Jersey 07080.  J.H. Reid is a self-proclaimed heavy highway and site contractor whose work includes demolition of industrial plants.

4.      Eric Reid is a resident of the state of New Jersey and the President of J.H. Reid. Mr. Reid, together with his father, James Reid, has exercised the final decision making authority on all business and salvage decisions involving the LLCs, J.H. Reid and Reid Commodities, LLC.

5.      James Reid is a resident of the state of New Jersey and is the founder of J.H. Reid. Mr. Reid, together with his son, Eric Reid, has exercised the final decision making authority on all business and salvage decisions involving the LLCs, J.H. Reid and Reid Commodities, LLC.

6.      Reid Commodities, LLC is an affiliate of J.H. Reid and is a New Jersey Limited Liability Company formed on December 14, 2010 specifically for the purpose of carrying out the transaction described in the Project Agreement.  Reid Commodities, LLC's initial registered office is located at Connell Foley, LLP, 85 Livingston Avenue, Roseland, NJ 07068 and its

principal place of business is 3230 Hamilton Boulevard, South Plainfield, New Jersey 07080.
Eric Reid is the Managing Member of Reid Commodities, LLC.

7.      LCH Commodities, LLC is a Delaware limited liability company with a principal
place of business at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  LCH
Commodities, LLC was formed under the Delaware Limited Liability Company Act as a single
purpose limited liability company to purchase, salvage and sell certain materials and assets
located at the Lon C. Hill power plant near Corpus Christi, Texas (the "Hill Plant") and then to
demolish the plant and grade the property.  Pursuant to the Project Agreement, the sole members
of LCH Commodities, LLC are Atlantic, J.H. Reid or an affiliate of J.H. Reid and Etco
Recycling Corporation ("Etco"), a New York corporation, or an affiliate of Etco.  Eric Reid is
the manager of LCH Commodities, LLC and J.H. Reid or its affiliate owns a 51% interest in
LCH Commodities, LLC.  Atlantic owns a 49% interest in LCH Commodities, LLC.
Notwithstanding the percentage membership interests, LCH Commodities, LLC's profits are to
be distributed in the following manner:  47% to J.H. Reid or its affiliate, 43% to Atlantic, and
10% to Etco.  The sole assets of LCH Commodities, LLC are the materials and assets at the Hill
Plant.

8.      JLB Commodities, LLC is a Delaware limited liability company with a principal
place of business at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  JLB
Commodities, LLC was formed under the Delaware Limited Liability Company Act as a single
purpose limited liability company to purchase, salvage and sell certain materials and assets
located at the J.L. Bates power plant near Mission, Texas (the "Bates Plant") and then to
demolish the plant and grade the property.  Pursuant to the Project Agreement, the sole members
of JLB Commodities, LLC are Atlantic, J.H. Reid or its affiliate and Etco or its affiliate.  Eric

Reid is the manager of JLB Commodities, LLC and J.H. Reid or its affiliate owns a 51% interest

in JLB Commodities, LLC.  Atlantic owns a 49% interest in JLB Commodities, LLC.

Notwithstanding the percentage membership interests, LCH Commodities, LLC's profits are

distributed in the following manner:  47% to J.H. Reid or its affiliate, 43% to Atlantic, and 10%

to Etco.  The sole assets of JLB Commodities, LLC are the material and assets at the Bates Plant.

## JURISDICTION AND VENUE

9.      The United States District Court for the District of Massachusetts has subject

matter jurisdiction over the Complaint pursuant to 28 U.S.C. § 1332, because the matter in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and because the

dispute concerns parties of different states.  *See* 28 U.S.C. § 1332.

10.      Jurisdiction also exists under 28 U.S.C. §§ 1331 and 1367 because the plaintiffs

assert a claim under the federal Racketeering Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. § 1961 et seq., and because the plaintiff's state law claims arise out of the

same facts, circumstances and transactions as that federal law claim.

11.      Venue is proper within the District of Massachusetts pursuant to 28 U.S.C. § 1391

because a substantial part of the events giving rise to the claims occurred in Massachusetts, the

contract at issue is governed by Massachusetts law, and because the defendants are subject to

personal jurisdiction in Massachusetts.  *See* 28 U.S.C. § 1391(a).

### FACTS

I.      **Atlantic Contracts To Purchase The Hill Plant And The Bates Plant**

12.      On or about October 29, 2010, Atlantic entered into a Purchase Agreement with

Lon C. Hill, L.P. to purchase the Hill Plant (the "Hill Contract").  Pursuant to the terms of the

Hill Contract, Atlantic made a deposit of $25,000 toward the full purchase price of the Hill Plant.

13.     That same day, Atlantic also entered into a Purchase Agreement with J.L. Bates, L.P. to purchase the Bates Plant (the "Bates Contract").  Pursuant to the terms of the Bates Contract, Atlantic made a deposit of $25,000 toward the full purchase price of the Bates Plant.

14.     Both the Hill Contract and the Bates Contract contemplated a period of due diligence by Atlantic to verify cost and revenue estimates for the demolition and salvage value of the plants.  A closing date of December 1, 2010 was originally contemplated.  That date was subsequently extended by agreement until December 16, 2010.

15.     At the time Atlantic entered into the Purchase Agreements for the Hill Plant and the Bates Plant, Atlantic intended to purchase, salvage, and sell certain materials and assets located at the Hill Plant and the Bates Plant itself.  Atlantic, however, soon determined that it would be unable to self-finance the total purchase price of $5 million for the Hill Plant and Bates Plant before the anticipated closing date and began looking for a partner or partners to complete the purchase of the assets and materials located at both plants.  That search led Atlantic to Etco and J.H. Reid and its principals, James Reid and Eric Reid.

**II.     The Project Agreement And The Failure Of The Reids To Abide By Its Terms**

16.     Following a series of meetings and discussions regarding the Hill Plant and the Bates Plant, which included due diligence visits by Eric Reid, James Reid, and other J.H. Reid representatives to both plants to assess for themselves the demolition costs for both plants and their salvage and scrap value, Atlantic entered into a Project Agreement with J.H. Reid and Etco on December 14, 2010 to perform and complete what the Project Agreement refers to as the Hill Project and the Bates Project.  The Reids and the other J.H. Reid representatives, Etco and Atlantic estimated that the combined net profit generated by the salvage and scrap sales from the Hill Plant and the Bates Plant, after deducting the acquisition and demolition costs, would be

between $7-10 million.  The parties also agreed that both projects would be completed within nine months of acquisition of the Hill Plant and Bates Plant.

17.    The Hill Project consisted of purchasing, salvaging, and selling the materials and assets at the Hill Plant and then demolishing the plant and grading the property. Similarly, the Bates Project consisted of purchasing, salvaging, and selling the materials and assets at the Bates Plant and then demolishing the plant and grading the property.  A true and exact copy of the Project Agreement is attached hereto as Exhibit A.

18.    Pursuant to the terms of the Project Agreement, Atlantic, J.H. Reid and Etco agreed to form two single purpose limited liability companies identified as "Hill LLC" and "Bates LLC" in the Project Agreement.  Hill LLC was subsequently formed as LCH Commodities, LLC and Bates LLC was subsequently formed as JLB Commodities, LLC.  LCH Commodities, LLC and JLB Commodities, LLC will be collectively referred to herein as the "LLCs."

19.    LCH Commodities, LLC was formed for the purpose of carrying out and completing the Hill Project.  Eric Reid is the Managing Member of LCH Commodities, LLC.

20.    JLB Commodities, LLC was formed for the purpose of carrying out and completing the Bates Project.  Eric Reid is also the Managing Member of JLB Commodities, LLC.

21.    Pursuant to the terms of the Project Agreement, Atlantic assigned its rights under the Hill Contract and the Bates Contract to Reid Commodities, LLC, an affiliate of J.H. Reid, which assumed all of Atlantic's rights and responsibilities under the Hill Contract and bates Contract.  Reid Commodities, LLC, which was managed by Eric Reid, in turn agreed to contribute and/or convey as appropriate the respective rights, title and interest in the equipment

and material it acquired to LCH Commodities, LLC and JLB Commodities, LLC under the Hill Contract and Bates Contract respectively.

22.    To help finance the acquisition of the Hill Plant and the Bates Plant, J.H. Reid or its affiliate borrowed a total of $2.5 million from a third party investor known only to J.H. Reid for a guaranteed interest payment of $300,000 and at an interest rate of 24% per annum (the "Purchase Loans") with no prepayment penalty.  Of this amount, $1.5 million was allocated for the purchase of the Hill Plant and $1 million was allocated for the purchase of the Bates Plant. The maturity dates of the Purchase Loans were not earlier than December 31, 2011 and the Purchase Loans were guaranteed by the assets of the Hill Plant and Bates Plant.  J.H. Reid or its affiliate provided the other $2.5 million for the combined $5 million acquisition price for the Hill Plant and Bates Plant.  Reid Commodities, LLC was the affiliate of J.H. Reid created for the purpose of acquiring the Hill Plant and Bates Plant.

23.    After the closing of sale of the Hill Plant and Bates Plant to Atlantic's assignee Reid Commodities, LLC on or about December 16, 2010, Reid Commodities, LLC transferred all of its right, title and interest in and to the equipment and material it acquired at the Hill Plant to LCH Commodities, LLC and all of its right, title and interest in and to the equipment and material it acquired at the Bates Plant to JLB Commodities, LLC.  In return, the LLCs agreed to (i) a promissory note for $1.5 million from LCH Commodities, LLC in favor of J.H. Reid or its affiliate at no interest with a maturity date of December 31, 2011, (ii) a promissory note for $1 million from JLB Commodities, LLC in favor of J.H. Reid or its affiliate at no interest with a maturity date of December 31, 2011, and (iii) the assumption of J.H. Reid's repayment obligations under the Purchase Loans.  The Project Agreement required that the LLCs were to

"use best efforts to repay the Purchase Loans in full within six months" so as not to incur any additional interest expense beyond the guaranteed interest payment of $300,000.

24.    Pursuant to the Project Agreement, the salvage operations and sale of the assets and materials (including scrap metals) at the Hill Project would be undertaken by LCH Commodities, LLC as directed by its manager, which was to be J.H. Reid or its affiliate.  J.H. Reid and its designee Reid Commodities, LLC appointed Eric Reid as the manager of LCH Commodities, LLC.  Eric Reid, however, took direction and followed the instructions of his father James Reid when carrying out his management duties.

25.    Similarly, the salvage operations and sale of the assets and materials (including scrap metals) at the Bates Project would be undertaken by JBH Commodities, LLC as directed by its manager, which was to be J.H. Reid or its affiliate.  J.H. Reid and its designee Reid Commodities, LLC appointed Eric Reid as the manager of JBH Commodities, LLC as well.  Eric Reid, however, took direction and followed the instructions of his father James Reid when carrying out his management duties.

26.    J.H. Reid and its designees, Reid Commodities, LLC and its manager Eric Reid, were given the responsibility for obtaining the best sale prices for the LLCs' assets and directing the sale of the assets for both the Hill Project and the Bates Project.

27.    J.H. Reid and/or its affiliate were also designated in the Project Agreement to undertake and complete the demolition of the buildings and to complete the final grading at the site for both the Hill Project and the Bates Project.  For these demolition services, J.H. Reid was to be paid "a market fee . . . on terms that are typical for the third party demolition operators in an arms-length transaction."  Similarly, the parties agreed that "[a]sbestos remediation at each of the Hill Plant and Bates Plant will be undertaken by a third party acceptable to the applicable

LLC, under a separate contract or subcontract." The LLCs were required to enter into a contract with J.H. Reid or its affiliate for these demolition services ("Demolition Contract") on or before December 22, 2010. No such contract was entered by the LLCs despite several inquiries and requests by Atlantic to see the contract.

28.     J.H. Reid and its designee Reid Commodities, LLC, which was and is managed by Eric Reid, were also given the authority, as manager of the LLCs, to make all business decisions for LCH Commodities, LLC and JLB Commodities, LLC, including decisions regarding the use of proceeds from the respective projects to pay costs, repay debt, and to make distributions to members in accordance with their percentage interest in the LLCs. But the authority for J.H. Reid and its designee Reid Commodities, LLC, which was and is managed by Eric Reid, to make these decisions was not unrestrained.

29.     As a balance on the powers of the manager of LCH Commodities, LLC and JLB Commodities, LLC, the Project Agreement imposed contractual obligations on J.H. Reid and its designee Reid Commodities, LLC, which was and is managed by Eric Reid, to consult with Atlantic before making any and all material decisions.

30.     For example, prior to making any decisions concerning salvage operations, and specifically including decisions regarding the negotiation of pricing and buyers of assets at either the Hill Project or the Bates Project, J.H. Reid and its designee Reid Commodities, LLC, which was and is managed Eric Reid, were required to consult with Atlantic and Etco. No such consultation occurred with Atlantic.

31.     The Project Agreement also mandated that all salvaged material and assets of the Hill Project and the Bates Project could only be sold to third parties in arms-length transactions at fair market rates for the account of the respective LLCs. The LLCs have not provided any

meaningful disclosure to Atlantic on their transactions with scrap buyers and the LLCs have

failed to satisfy this provision of the Project Agreement in that (i) J.H. Reid or an affiliate

received and failed to account for a $1 million advance payment from a buyer of the scrap metal

removed from the Bates Plant, (ii) Atlantic was told by a J.H. Reid employee that the LLCs have

failed to account for several thousand tons of steel removed on rail cars and trucks from the

Bates Plant and Hill Plant, (iii) the LLCs refused to sell scrap material to a buyer proposed by

Atlantic who had provided a written quote at a higher price per ton than the buyer subsequently

selected by J.H. Reid and its designee Eric Reid, (iv) Atlantic was told by a J.H. Reid employee

that two pieces of equipment were removed from the Hill Plant and sold for $800,000 but were

recorded as $80,000 sales, and (v) Atlantic was told by a J.H. Reid employee that there have

been many unreported and unrecorded sales of scrap materials from the Hill Plant and Bates

Plant.  J.H. Reid and its designee Reid Commodities, LLC, which was and is managed by Eric

Reid who acted at the direction of James Reid, engaged in the foregoing acts deliberately in

order to conceal the true value of the LLCs' assets from Atlantic and to avoid paying Atlantic its

fair and required share of the profit distributions from the Bates Project and the Hill Project.

32.     In addition, prior to making any business decisions for LCH Commodities, LLC

or JLB Commodities, LLC, and specifically including (i) decisions regarding the use of any

project proceeds to pay project costs and expenses, (ii) decisions to repay project debt, and (iii)

decisions to make distributions to members in accordance with their percentage interests in the

LLCs, J.H. Reid and its designee Reid Commodities, LLC, which was and is managed by Eric

Reid, were required to consult with Atlantic and Etco.  No such consultation occurred.  To the

contrary, the LLCs have not disclosed any decision or plan with regard to the payment of project

costs and expenses or the repayment of the Purchase Loans, and have not made any profit

distributions to Atlantic despite the fact that the work at both the Bates Plant and Hill Plant was to be and should have been concluded on or before December 31, 2011.

33.     Moreover, on information and belief because the LLCs have not provided any meaningful information to Atlantic, the LLCs acting at the direction of J.H. Reid, Eric Reid and James Reid failed to use best efforts and failed to repay the Purchase Loans within 6 months, thereby requiring the LLCs to pay additional interest on the Purchase Loans at the rate of 24% per annum increasing the project costs and diluting the profit available to Atlantic as a member of the LLCs.

34.     At the direction of J.H. Reid, Eric Reid, and James Reid, the LLCs also incurred excessive and unnecessary expenses by renting various pieces of heavy equipment from a J.H. Reid affiliate.  The equipment was either not necessary for the projects or was rented for much longer periods than required to complete the demolition work.  J.H. Reid in essence used the Hill Project and Bates Project to pay the finance charges for this heavy equipment that otherwise would have been an expense for J.H. Reid or one of its affiliates.  Additional equipment such as generators, torches, and quick disconnects were also purchased by J.H. Reid with proceeds generated by the salvage operations and the sale of scrap materials from the Hill Plant and Bates Plant.

35.     The LLCs, at the direction of J.H. Reid, Eric Reid, and James Reid, also failed to report and account for significant revenue generated from the sale of salvaged material and assets from the Hill Project and Bates Project to LCH Commodities, LLC and JLB Commodities, LLC respectfully.  Instead, J.H. Reid, Eric Reid, and James Reid diverted the revenue generated from these sales for their own use, profit and enjoyment and in the process deliberately harmed Atlantic.

### III.     The Reids Hatch Their Plan To Divert Assets and Minimize Profits for the LLCs

36.     When the Project Agreement was entered in December 2010, Atlantic, J.H. Reid, Etco and their respective principals were all in agreement that the Hill Project and the Bates Project were going to be highly profitable endeavors.  With their combined experience in the demolition business, the parties were able to estimate the demolition costs and scrap values and determine that the combined profit generated from both the Hill Project and the Bates Project would be between $7 and $10 million.  These figures were again discussed and during a breakfast meeting in Houston, Texas in January 2011.  During that meeting Eric Reid indicated to Atlantic that he agreed with the cost, revenue and profit estimates.  He also joked with Atlantic that the expenses might be $200,000 higher because his father would be involved on the job sites and that he liked to stay at nice hotels, but that this expense would be taken out of J.H. Reid's profit share.

37.     Around this time or shortly thereafter and unbeknownst to Atlantic and Etco, J.H. Reid, Eric Reid and James Reid decided that rather than share the profit with Atlantic and Etco, they would take the profit for themselves and set out to do just that while stringing Atlantic and Etco along.

38.     In early 2011, Etco brought a potential buyer for scrap material at the Hill Plant and Bates Plant to the LLCs.  The buyer, after touring both the Hill Plant and Bates Plant, was interested in purchasing all of the steel and other scrap materials at both plants outright and was prepared to offer approximately $20 million plus the cost of demolition to the LLCs.  James Reid, however, refused to engage in any discussions with the buyer and Eric Reid, as the manager of Reid Commodities, LLC and the LLCs, allowed the opportunity for a quick sale and profit to pass.

39.     In hindsight, it is apparent that the Reids refused to consider any such sale because they did not want to share the profit with Atlantic and Etco.  In addition, on information and belief, without informing Atlantic or Etco, the Reids had plans to reach or had already reached an undisclosed agreement with a buyer of scrap materials pursuant to which J.H. Reid or its affiliate would receive a $1 million advance payment for the rights to the steel and scrap materials at both plants.  The Reids could not have benefitted from this undisclosed agreement if the LLCs had closed the deal with Etco's proposed buyer.

40.     Shortly after the Reids refused to entertain the proposal from the buyer that Etco brought to the table, J.H. Reid and the Reids embarked on a campaign to keep Atlantic in the dark about what was going on at both projects.  By way of example, Salvatore Tecce, a member of Atlantic, reached out to Eric Reid, the manager of the LLCs, by email to express some concerns about J.H. Reid's treatment of an Atlantic representative with considerable demolition experience who was sent by Atlantic to observe the work being done by J.H. Reid at both projects.  Atlantic reported that its representative was "getting some slack" from the J.H. Reid project supervisor Tom Smith who confronted the Atlantic representative by asking "Who the f*** are you?" and "What are you doing here?"  Atlantic asked Eric Reid to give Mr. Smith a call and to assist in any way he could.

41.     In response, Eric Reid wrote in an email that "My father [James Reid] and Tom [Smith] called the plant manager from Brownsville [an Atlantic demolition project] this morning and the guy said that Jim [the Atlantic representative] is the worlds [sic] biggest a-hole.  My Father [sic] wants nothing to do with him and I am sure he expressed that to Tom as he expressed it to me.  I don't know what to tell you other than give it a try.  If my father throws

him off the job so be it.  I said he should wait till [sic] next Monday to come.  I am staying out of it.  I don't need the aggravation.  You can deal with it with my father if that is what it comes to."

42.     Atlantic was taken aback at the brush-off by the Projects' manager and responded through an email by Mr. Tecce who stated:  "I truly don't know what to say other than everyone has a right to their opinions.  I'm sure in our business there are people who have contrary opinions or feelings about us!  I come from a place where you give someone the chance to hang himself."  Mr. Tecce continued "Honestly Eric, do [you] want us to stay away completely, we have always agreed to [J.H.] Reid being the manager, that's never been a problem for us. However we felt that if we can incorporate one person from Atlantic into the force, with you in control, if they don't cut it, fire him.  We can't even get to that point."

43.     Eric Reid, who at this point had taken on the good-cop role to James Reid's bad-cop role, a routine that would continue throughout both projects responded:  "You will also learn that it will make everyones [sic] life a lot easier if we don't do this type of thing on the two days a month that my father is there.  Best [thing] to do is stay away and let Tom deal with him."  He then went on to encourage Atlantic by adding later:  "I am sure it will work out."

44.     Two days after this exchange, Atlantic sent another email to Eric Reid regarding the Bates Plant and provided him with estimates on the tonnage of scrap materials at the Bates Plant.  Atlantic sent these estimates in response to statements by Eric Reid that his father James Reid believed the original steel estimates were high and that there was far less other scrap metals like copper.  After Atlantic reconfirmed their estimates, Eric Reid discussed the estimates with Atlantic and stated that he did not believe the information being reported by his father.

45.     Atlantic also provided Eric Reid with the benefit of its experience with salvaging turbines from another project and implored Reid as follows:  "Eric we can help, in this, how

about letting Jim just stand next to Tom and offer opinion only when asked?  Maybe when your

dad is not around???  One way or the other it would behoove us to have Tom and Jim work

together."  Atlantic then informed Eric Reid that its representative was "making his way to

Corpus [the Hill Plant] and will report back by afternoon."  And in response to James Reid's

statements questioning the amount of copper to be salvaged from the projects Atlantic stated:  "I

can't believe there is no copper, what conducts the power[?]  Its probably one of the super alloys

they are looking at."

46.     Eric Reid, realizing that Atlantic would not relent on this point, responded "Ok.

Tom is prepared to work with Jim.  I am glad he is there [to] look out for your interests.  Ask him

to meet Tom when he gets back to Mission [the Bates Plant]."

47.     If only Eric Reid was being truthful.  In actuality, while Eric Reid was telling the

Atlantic principals that everything would be fine, the working relationship between J.H. Reid and

Atlantic at the job sites deteriorated rapidly and through no fault of Atlantic.  When Atlantic's

representative showed up at the Bates Plant to observe the work being performed he was not

warmly received by J.H. Reid employees and routinely found nails and screws in his truck tires.

Further, James Reid instructed all of the J.H. Reid employees that they were not to speak with

Atlantic's representative and the J.H. Reid employees became agitated when he questioned the

scrap value of the copper and a relatively new transformer that was on the job site.  He was also

told by a J.H. Reid employee that if something "were to happen to him" on the job site, it would

be his own fault.  After about a week of this treatment from J.H. Reid, Atlantic's representative

refused to return to the work site.  But before he left, he was able to provide Atlantic with

updates and pictures which showed the early stages of J.H. Reid's diversion of profits as

Atlantic's representative observed loads of scrap iron being removed by truck when J.H. Reid was supposed to remove all of the scrap iron by rail instead.

48.    When Atlantic called Eric Reid to express their concerns about what was being reported by Atlantic's representative, he responded that he would look into it but that Atlantic shouldn't worry about it and that he would make sure that everything would work out in the end as planned.  This was consistent with Eric Reid's responses to the several inquiries raised by Atlantic between January 2011 and April 2011 regarding various project issues such as (i) being given a copy of the arms-length demolition contract the LLCs were supposed to have entered with J.H. Reid in December 2010, (ii) the status and schedule of the hazardous material remediation which needed to be completed before the scrap could be removed, (iii) the project schedule and profit distribution schedule, and (iv) the LLCs' plans for selling the scrap materials. In every instance Eric Reid would put Atlantic off or state that he would check on it while also reassuring Atlantic that there was nothing to worry about.

49.    In May 2011, as the six month mark was approaching, which was the target date to repay the Purchase Loans, Atlantic asked whether the Purchase Loans would be repaid on time.  Eric Reid's response was non-committal.  He also indicated that their buyer was having trouble freeing up enough trucks to remove the required volume of scrap materials to be able to make any distributions in the immediate future.  When Gabriel Frassetti, one of the principals for Atlantic offered to use his contacts to help, he was refused by Eric Reid and James Reid.  In fact, Eric Reid, on the insistence of James Reid, barred Mr. Frassetti from both job sites just as they had run off Atlantic's representative earlier in the projects.

50.    Finally, in August 2011, Atlantic insisted that it be allowed on the job sites.  Mr. Frassetti and another Atlantic representative visited the Bates Plant and the Hill Plant.  When

they arrived they asked to see shipping manifests, bills of lading, and security entry logs for all vehicle traffic on and off the job sites.  They were refused.  When Atlantic called Eric Reid to ask for his intervention, he said he would instruct the J.H. Reid employees to provide the requested records for both Plants.  But Mr. Frassetti was only given the security entry logs for the Hill Plant through August 2011.  He was not given any shipping manifests or bills of lading from either project and received no documents at all from the Bates Plant.

51.     Following this episode, Atlantic made several written demands to for these and other records.  When these requests were ignored, Atlantic's counsel made the same request to counsel for J.H. Reid and the Reids.  After several weeks, some records were eventually produced to Atlantic but none of the pertinent records regarding the sales and shipments of scrap materials from both projects were produced.  No meaningful records have ever been provided to Atlantic to verify the revenue generated by scrap sales at either the Hill Plant or the Bates Plant.

52.     It was around this time period that Atlantic began receiving reports from professional contacts in the demolition business that J.H. Reid was going to overrun costs and not pay Atlantic its fair share of the profits from both projects.  Atlantic was told that the Reids and J.H. Reid were going to claim that the project expenses exceeded the revenues produced from the scrap sales.

53.     Atlantic subsequently requested a meeting with Eric Reid.  At that meeting, as predicted, Eric Reid stated the project was "upside down" in terms of expenses and revenues and that approximately 22 train cars and 18 truck loads were unaccounted for in the pro forma reports that had been provided to Atlantic, but without any of the required or requested back-up information.  Following the meeting in late 2011 between Eric Reid and the Atlantic principals, no further information has been provided to Atlantic regarding the project expenses and sales.

54.     It is now February, long past the time for the completion of both the Hill Project and Bates Project and no distributions have been made to Atlantic and no accounting has been provided despite Atlantic's many requests for such information.

## COUNT I: BREACH OF CONTRACT
### (Against J.H. Reid)

55.     Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 54 above.

56.     J.H. Reid and its designee Reid Commodities, LLC, which was and is managed by Eric Reid, have breached the Project Agreement with Atlantic as set forth above.

57.     In breach of the Project Agreement, J.H. Reid and its designee Reid Commodities, LLC, which was and is managed by Eric Reid, failed or refused to consult with Atlantic concerning the salvage operations at the Hill Project and the Bates Project.  Specifically, J.H. Reid failed or refused to consult with Atlantic concerning the pricing for salvaged materials and assets from the Hill Plant and/or the Bates Plant and the buyers of the salvaged materials and assets.

58.     The Project Agreement also mandated that all salvaged material and assets could only be sold to third parties in arms-length transactions at fair market rates for the account of the LLC.

59.     In breach of the Project Agreement, upon information and belief, J.H. Reid and its designee Reid Commodities, LLC, which was and is managed by Eric Reid, sold salvaged materials and assets of the Hill Project and/or the Bates Project for their own benefit or the benefit of their affiliates.

60.     The Project Agreement also required J.H. Reid, and its designee Reid Commodities, LLC, which was and is managed by Eric Reid, to consult with Atlantic concerning business decisions for both LCH Commodities, LLC and JLB Commodities, LLC.

61.     In breach of the Project Agreement, J.H. Reid , and its designee Reid Commodities, LLC, which was and is managed by Eric Reid, failed or refused to consult with Atlantic before making various business decisions for LCH Commodities, LLC and/or JLB Commodities, LLC.  Specifically, these defendants failed to consult with Atlantic concerning use of revenue from the Hill Plant and/or the Bates Plant to pay costs and expenses, including multiple and various payments to J.H. Reid.

62.     The Project Agreement required J.H. Reid, and its designee Reid Commodities, LLC , which was and is managed by Eric Reid, to use "best efforts" to repay the Purchase Loans that were obtained to finance the acquisition of the Hill Plant and the Bates Plant within six months of the date the Purchase Loans were made.

63.     In breach of the Project Agreement, J.H. Reid, and its designee Reid Commodities, LLC, which was and is managed by Eric Reid, failed to use best efforts to repay the Purchase Loans in full within six months after the Purchase Loans were made.

64.     Atlantic performed all of its obligations under the Project Agreement prior to J.H. Reid's material breaches.

65.     As a result of J.H. Reid's material breaches, described above, Atlantic has suffered, and continues to suffer, substantial harm and damages in an amount to be determined at trial.

## COUNT II: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (Against J.H. Reid)

66.     Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 65 above.

67.     The Project Agreement included an implied covenant of good faith and fair dealing.

68.     J.H. Reid's actions constitute a breach of the implied covenant of good faith and fair dealing.

69.     Atlantic performed all of its obligations under the Project Agreement prior to J.H. Reid's material breaches.

70.     As a result of J.H. Reid's material breaches, described above, Atlantic has suffered, and continues to suffer, substantial harm and damages in an amount to be determined at trial.

## COUNT III: INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Reid Commodities, LLC, James Reid, and Eric Reid)

71.     Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 70 above.

72.     Atlantic had a valid and existing contract and business relationship with J.H. Reid concerning LCH Commodities, LLC and JLB Commodities, LLCs.

73.     As the founder of J.H. Reid and one of the two individuals responsible for directing J.H. Reid's actions, James Reid knew about Atlantic's contract with J.H. Reid including its terms.

74.     As the President of J.H. Reid and one of the two individuals responsible for directing J.H. Reid's actions, James Reid knew about Atlantic's contract with J.H. Reid including its terms.

75.     James Reid, Eric Reid and Reid Commodities, LLC intentionally engaged in wrongful acts to interfere with and disrupt these contractual and business relationships. Specifically, as the individuals responsible for controlling J.H. Reid's actions, James Reid and Eric Reid repeatedly directed J.H. Reid to not consult with Atlantic before making salvage or business decisions for LCH Commodities, LLC or JLB Commodities, LLC.  James Reid and Eric Reid also directed Reid Commodities, LLC and J.H. Reid not to use best efforts to repay the Project Loans.

76.     The tortious interference by James Reid, Eric Reid and Reid Commodities, LLC with Atlantic's contractual and business relationships with J.H. Reid was and is improper, willful, and malicious and has caused and likely will cause a disruption of Atlantic's contractual and business relationships with J.H. Reid.

77.     As a direct and proximate result of the tortious inference by James Reid, Eric Reid and Reid Commodities, LLC, Atlantic has suffered and will continue to suffer damages in an amount to be proven at trial.

### COUNT IV: BREACH OF FIDUCIARY DUTY
### (Against Eric Reid and Reid Commodities, LLC)

78.     Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 77 above.

79.     Eric Reid is the appointed manager of Reid Commodities, LLC, LCH Commodities, LLC and JLB Commodities, LLC.  Reid Commodities, LLC owns a 51% interest in LCH Commodities, LLC and JLB Commodities, LLC.

80.     As the majority member in LCH Commodities, LLC and JLB Commodities, LLC, as well as the manager of LCH Commodities, LLC, JLB Commodities, LLC, the Hill Project, and the Bates Project, Eric Reid and Reid Commodities, LLC owe traditional fiduciary duties of care and loyalty to Atlantic.

81.     Eric Reid and Reid Commodities, LLC breached their fiduciary duties to Atlantic by *inter alia*, engaging in self dealing and self interested transactions, including diverting the revenues generated from the sale of material and assets salvaged from the Hill Project and the Bates Project to J.H. Reid or its affiliates and by causing LCH Commodities, LLC and JLB Commodities, LLC to pay inflated costs for renting unnecessary equipment from J.H. Reid or its affiliates.  Eric Reid and Reid Commodities, LLC also breached their fiduciary duties to Atlantic by failing to report and account for all of the revenue generated from the sale of material and assets salvaged from the Hill Project to LCH Commodities, LLC and by failing to report and account for all of the revenue generated from the sale of material and assets salvaged from the Bates Project to JLB Commodities, LLC.

82.     These breaches of fiduciary duties caused a reduction in the amount of profit generated by LCH Commodities, LLC and JLB Commodities, LLC that is available for distribution to the members of LCH Commodities, LLC and JLB Commodities, LLC, including Atlantic.

83.     As a result of the breaches of fiduciary duties by Eric Reid and Reid Commodities, LLC described above, Atlantic has suffered, and continues to suffer, substantial harm and damages in an amount to be determined at trial.

## COUNT V: BREACH OF FIDUCIARY DUTY
### (Derivatively on Behalf of LCH Commodities, LLC Against Eric Reid and Reid Commodities, LLC)

84.    Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 83 above.

85.    Eric Reid is the appointed manager of Reid Commodities, LLC, LCH Commodities, LLC and JLB Commodities, LLC.  Reid Commodities, LLC owns a 51% interest in LCH Commodities, LLC and JLB Commodities, LLC.

86.    As the majority member in LCH Commodities, LLC, as well as the manager LCH Commodities, LLC, the bates Project and the Hill Project, Eric Reid and Reid Commodities, LLC owed fiduciary duties to LCH Commodities, LLC.

87.    Eric Reid and Reid Commodities, LLC breached their fiduciary duties to LCH Commodities, LLC by *inter alia*, engaging in self dealing and self interested transactions, including diverting the revenues generated from the sale of material and assets salvaged from the Hill Project to J.H. Reid or its affiliates and by, for example, causing LCH Commodities, LLC to pay inflated costs for renting unnecessary equipment from J.H. Reid or its affiliates.  These defendants also breached their fiduciary duties to LCH Commodities, LLC by failing to report and account for all of the revenue generated from the sale of material and assets salvaged from the Hill Project to LCH Commodities, LLC.

88.    Atlantic contacted Reid Commodities, LLC and Eric Reid several times to demand that such self-dealing, diversion of corporate interests and opportunities and self-interested transactions cease.  Reid Commodities, LLC and Eric Reid consistently refused to do so.

89.     Eric Reid and Reid Commodities, LLC had a material, disqualifying self interest in the transaction when they caused LCH Commodities, LLC to pay revenue to J.H. Reid or its affiliates from the Hill Project.

90.     Because the actions that Eric Reid and Reid Commodities, LLC have caused LCH Commodities, LLC to undertake, including the payment of project proceeds to J.H. Reid, were material to Eric Reid and Reid Commodities, LLC and they are the manager and majority shareholder in LCH Commodities, LLC with a controlling interest in LCH Commodities, LLC respectively, demand upon LCH Commodities, LLC to sue these defendants would be futile.  As such, demand upon LCH Commodities, LLC is excused.

91.     As a result of the breaches of fiduciary duty by Eric Reid and Reid Commodities, LLC described above, LCH Commodities, LLC has suffered, and continues to suffer, substantial harm and damages in an amount to be determined at trial.

## COUNT VI: BREACH OF FIDUCIARY DUTY
### (Derivatively on Behalf of JLB Commodities, LLC Against Eric Reid and Reid Commodities, LLC)

92.     Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 91 above.

93.     Eric Reid is the appointed manager of Reid Commodities, LLC, LCH Commodities, LLC and JLB Commodities, LLC.  Reid Commodities, LLC owns a 51% interest in LCH Commodities, LLC and JLB Commodities, LLC.

94.     As the majority member in JLB Commodities, LLC, as well as the manager of JLB Commodities, LLC and the Bates Project, Reid Commodities, LLC and Eric Reid owed fiduciary duties to JLB Commodities, LLC.

95.     Reid Commodities, LLC and Eric Reid breached their fiduciary duties to JLB Commodities, LLC by *inter alia*, engaging in self dealing and self interested transactions, including diverting the revenues generated from the sale of material and assets salvaged from the Bates Project to J.H. Reid or its affiliates by, for example, causing JLB Commodities, LLC to pay inflated costs for renting unnecessary equipment from J.H. Reid.  Reid Commodities, LLC and Eric Reid also breached their fiduciary duties to JLB Commodities, LLC by failing to report and account for all of the revenue generated from the sale of material and assets salvaged from the Bates Project to JLB Commodities, LLC.

96.     Atlantic contacted Reid Commodities, LLC and Eric Reid several times to demand that these defendants cease such self-dealing, diversion of corporate interests and opportunities and self-interested transactions.  Reid Commodities, LLC and Eric Reid consistently refused to do so.

97.     Reid Commodities, LLC and Eric Reid had a material, disqualifying self interest in the transactions when they caused JLB Commodities, LLC to pay revenue to J.H. Reid or its affiliates from the Bates Project and when it failed to account for the revenue generated by the sale of material and assets salvaged from the Bates Project.

98.     Because the actions that Reid Commodities, LLC and Eric Reid have caused JLB Commodities, LLC to undertake, including the payment of revenue to J.H. Reid, were material to Eric Reid and Reid Commodities, LLC as the manager and the majority shareholder in JLB Commodities, LLC with a controlling interest in JLB Commodities, LLC respectively, demand upon JLB Commodities, LLC to sue Reid Commodities, LLC and Eric Reid would be futile.  As such, demand upon JLB Commodities, LLC is excused.

99.     As a result of the breaches of fiduciary duty by Reid Commodities, LLC and Eric Reid described above, JLB Commodities, LLC has suffered, and continues to suffer, substantial harm and damages in an amount to be determined at trial.

### COUNT VII: CONVERSION
### (Derivatively on Behalf of LCH Commodities, LLC Against Eric Reid, James Reid, Reid Commodities, LLC and J.H. Reid)

100.     Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 99 above.

101.     As alleged herein, Eric Reid, James Reid, Reid Commodities, LLC and J.H. Reid have diverted assets away from LCH Commodities, LLC to themselves and engaged in self dealing, self interested transactions, and repeated breaches of fiduciary duties.

102.     By the conduct described above, these defendants have wrongfully exercised dominion over, and thereby have converted to their own benefit, certain assets they have received and continue to receive from the Hill Project, to which they have no right of possession.

103.     Such assets include, but are not limited to:

a.     revenues from the sale of salvaged materials and assets from the Hill Project which defendants failed to record as revenue for LCH Commodities, LLC;

b.     revenues from the sale of salvaged materials and assets from the Hill Project which defendants have wrongfully used to pay inflated expenses to J.H. Reid; and

c.     salvaged materials and assets from the Hill Project.

104.     Such detention, misuse and assertion of ownership over such assets constitutes conversion.

105.    As a result of the defendants' conversions described above, LCH Commodities, LLC has suffered, and continues to suffer, substantial harm and damages in an amount to be determined at trial.

### COUNT VIII: CONVERSION
**(Derivatively on Behalf of JLB Commodities, LLC Against J.H. Reid, Reid Commodities, LLC and Eric Reid)**

106.    Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 105 above.

107.    As alleged herein, Eric Reid, James Reid, Reid Commodities, LLC and J.H. Reid diverted assets away from JLB Commodities, LLC to themselves and engaged in self dealing, self interested transactions, and repeated breaches of fiduciary duties.

108.    By the conduct described above, these defendants have wrongfully exercised dominion over, and thereby have converted to their own benefit, certain assets they have received and continue to receive from the Bates Project, to which they have no right of possession.

109.    Such assets include, but are not limited to:

   a.   revenues from the sale of salvaged material and assets from the Bates Project which defendants have failed to record as revenue for JLB Commodities, LLC;

   b.   revenues from the sale of salvaged materials and assets from the Bates Project which defendants have wrongfully used to pay inflated expenses to themselves; and

   c.   salvaged materials and assets from the Bates Project.

110.    Such detention, misuse and assertion of ownership over such assets constitutes conversion.

111.    As a result of these defendants' conversions, described above, JLB Commodities, LLC has suffered, and continues to suffer, substantial harm and damages in an amount to be determined at trial.

## COUNT IX: ACCOUNTING
### (Derivatively on Behalf of LCH Commodities, LLC Against Eric Reid and Reid Commodities, LLC)

112.    Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 111 above.

113.    As alleged herein, Eric Reid and Reid Commodities, LLC diverted assets away from LCH Commodities, LLC to themselves or their affiliates and engaged in self dealing, self interested transactions, and repeated breaches of fiduciary duties.

114.    Atlantic requests that this Court order the defendants, at the sole expense of defendants, to make a full and complete accounting of all assets, revenues, and expenses related to the Hill Project since December 14, 2010, including a detailed accounting of all payments, conveyances, transfers and assignments, of any money and property to or from J.H. Reid and/or any third parties relating to the business of LCH Commodities, LLC.

## COUNT X: ACCOUNTING
### (Derivatively on Behalf of JLB Commodities, LLC Against Eric Reid and Reid Commodities, LLC)

115.    Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 114 above.

116.    As alleged herein, Eric Reid and Reid Commodities, LLC diverted assets away from JLB Commodities, LLC to themselves and their affiliates and engaged in self dealing, self interested transactions, and repeated breaches of fiduciary duties.

117.    Atlantic requests that this Court order the defendants, at the sole expense of the defendants, to make a full and complete accounting of all assets, revenues, and expenses related to the Bates Project since December 14, 2010, including a detailed accounting of all payments, conveyances, transfers and assignments, of any money and property to or from J.H. Reid and/or any third parties relating to the business of JLB Commodities, LLC.

## COUNT XI: CONSTRUCTIVE TRUST
### (Derivatively on Behalf of LCH Commodities, LLC Against Eric Reid, James Reid, J.H. Reid and Reid Commodities, LLC)

118.    Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 117 above.

119.    As alleged herein, defendants diverted assets away from LCH Commodities, LLC to themselves and their affiliates and engaged in self dealing, self interested transactions, and repeated breaches of fiduciary duties.

120.    If defendants received or will receive any benefits as a result of any breach of fiduciary duty and/or conversion of LCH Commodities, LLC's assets, defendants will be unjustly enriched.

121.    Atlantic requests that this Court impose a constructive trust in favor of LCH Commodities, LLC of all of the assets, including revenue, tangible property, sale proceeds, or other property, relating to the business of LCH Commodities, LLC that were paid to or are in the possession, custody, or control of defendants and declare that the defendants hold these assets as a constructive trustee for the benefit of LCH Commodities, LLC.

## COUNT XII: CONSTRUCTIVE TRUST
### (Derivatively on Behalf of JLB Commodities, LLC Against Eric Reid, James Reid, J.H. Reid and Reid Commodities, LLC)

122.    Atlantic incorporates and restates each of the allegations contained in paragraphs 1 through 121 above.

123.    As alleged herein, defendants diverted assets away from JLB Commodities, LLC to themselves and engaged in self dealing, self interested transactions, and repeated breaches of fiduciary duties.

124.    If defendants received or will receive any benefits as a result of any breach of fiduciary duty and/or conversion of JLB Commodities, LLC's assets, defendants will be unjustly enriched.

125.    Atlantic requests that this Court impose a constructive trust in favor of JLB Commodities, LLC of all of the assets, including revenue, tangible property, sale proceeds, or other property, relating to the business of JLB Commodities, LLC that were paid to or are in the possession, custody or control of defendants and declare that defendants hold these assets as a constructive trustee for the benefit of JLB Commodities, LLC.

## COUNT XII—CIVIL RICO

### (Against J.H. Reid, Reid Commodities, LLC, Eric Reid and James Reid)

126.    Atlantic incorporates by reference the allegations contained in paragraphs 1 through 125 as if set forth fully herein.

127.    At all relevant times, J.H. Reid, Reid Commodities, LLC, Eric Reid and James Reid were "persons" within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(3) and 1962(c).

128.    The defendants formed an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961, for the purpose of committing multiple counts of fraud on the plaintiff and on other victims.

129.    The defendants, acting as an enterprise, conducted or participated in, directly or indirectly, the enterprise's affairs through a pattern of racketeering activity with the meaning of RICO, 118 U.S.C. § 1961, in violation of RICO, 18 U.S.C. § 1962.

130.    Specifically, at all relevant times, the defendants engaged in "racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961, by engaging in the acts set forth above. The acts set forth above constitute a violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud). The defendants each committed and/or aided and abetted in the commission of two or more of these acts of racketeering activity on the plaintiffs as well as other victims.

131.    These acts of racketeering constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961. The acts alleged were related to each other by virtue of common participants (the defendants), common victims (the plaintiff and others), and the common purpose and common result of defrauding the plaintiff of several million dollars and enriching the defendants at plaintiff's expense while concealing defendants' fraudulent activities.

132.    The acts of mail fraud and wire fraud were committed by means of making fraudulent statements to the plaintiff through interstate telephone calls and emails, as set forth above.

133.    As a result of the defendants' violation of 18 U.S.C. § 1962, the plaintiff was defrauded of substantial monies as a result of the defendants' fraudulent scheme.

134.    As a result of their misconduct, the defendants are liable to the plaintiff for the losses in an amount to be proved at trial.

135.    Pursuant to RICO, 18 U.S.C. § 1964, the plaintiff is entitled to recover three times its damages plus costs and attorneys' fees.

## PRAYERS FOR RELIEF

WHEREFORE, Atlantic requests that this honorable Court:

1.    Enter judgment in favor of Atlantic on all Counts;

2.    Award Atlantic all direct, consequential, recissory, and incidental damages suffered by Atlantic;

3.    Award LCH Commodities, LLC all direct, consequential, recissory, and incidental damages suffered by LCH Commodities, LLC;

4.    Award JLB Commodities, LLC all direct, consequential, recissory and incidental damages suffered by JLB Commodities, LLC;

5.    Order such preliminary injunctive and equitable relief against defendants in order to protect the assets rightfully belonging to LCH Commodities, LLC and JLB Commodities, LLC pending the final adjudication of this lawsuit;

6.    Order such permanent injunctive and equitable relief as is just and proper upon final adjudication of this matter;

7.    Order such equitable relief to rescind self-interested transactions, self-dealing and other breaches of fiduciary duties by defendants;

8.    Order the defendants, at their sole expense, to make a full and complete accounting of all assets, revenues, and expenses at the Bates Plant since December 14, 2010, including a detailed accounting of all payments, conveyances, transfers and assignments, of any money and property to or from defendants and/or any third parties relating to the business of JLB Commodities, LLC;

9.    Order the defendants, at their sole expense, to make a full and complete accounting of all assets, revenues, and expenses at the Hill Plant since December 14, 2010, including a detailed accounting of all payments, conveyances, transfers and assignments, of any money and property to or from defendants and/or any third parties relating to the business of LCH Commodities, LLC;

10.    Impose a constructive trust in favor of LCH Commodities, LLC of all of the assets, including revenue, tangible property, sale proceeds, or other property, relating to the business of LCH Commodities, LLC that were paid to or are in the possession, custody or control of defendants and declare that defendants hold these assets as a constructive trustee for the benefit of LCH Commodities, LLC;

11.    Impose a constructive trust in favor of in favor of JLB Commodities, LLC of all of the assets, including revenue, tangible property, sale proceeds, or other property, relating to the business of JLB Commodities, LLC that were paid to or are in the possession, custody or control of defendants and declare that defendants holds these assets as a constructive trustee for the benefit of JLB Commodities, LLC;

12.    Order prejudgment and post judgment interest at the maximum legal rate;

13.    Order disgorgement of all improper benefits, profits, and/or gains;

14.    Award Atlantic its costs and reasonable attorneys' fees; and

15.    Order such other relief as the Court deems just and equitable.

## JURY DEMAND

Atlantic hereby demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

Atlantic Acquisitions, LLC
By its Attorneys,

Keith P. Carroll, BBO# 666039
Wynter N. Lavier, BBO# 670618
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
617-542-6000
kcarroll@mintz.com
wlavier@mintz.com

Dated: February 8, 2012